No. 47,262

GEORGE A. ANGLE, d/b/a FRONTIER OIL COMPANY, *Appellee,* v. THE BOARD OF COUNTY COMMISSIONERS OF RUSH COUNTY, KANSAS, Consisting of JOHN B. KOBER, RAYMOND REICHEL and REUBEN ROMEISER; RUTH ANNE KRUG, County Treasurer of Rush County, Kansas, and EVELYN BUSSART, County Clerk of Rush County, Kansas, *Appellants.*

(522 P. 2d 347)

Opinion filed May 11, 1974.

*John C. Woelk,* of Woelk and Culley, of Russell, argued the cause, and *Ivan Krug,* county attorney, was with him on the brief for the appellants.

*Gerald Sawatzky,* of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause, and *John J. Stang,* of La Crosse, was with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: In the court below these were four consolidated actions brought by a taxpayer under K. S. A. 79-2005 to recover taxes paid under protest, covering first and second half taxes for the years 1970 and 1971, on seven oil and gas leases in Rush county. The controversy was over the value of the underlying reservoirs; no issue was raised as to the value of the equipment. The trial court granted judgment for the taxpayer, and the defendant taxing authorities have appealed.

Plaintiff taxpayer is an independent oil and gas operator who has, over the years, drilled numerous oil and gas wells in and around

Rush county, Kansas. Commencing in 1966, he drilled several leases in Rush county, in the immediate area of the leases involved in this suit.

The Lansing oil reservoir in this area was shown to be a short-lived gas drive reservoir. In all instances where production was obtained, the initial production for three to six months was quite high, followed by a steep decline. Plaintiff testified that, in his experience, to obtain maximum production from this type reservoir a well should be produced to its full capability in order to take advantage of the gas drive, which tended to dissipate in a short period of time regardless of the rate of production. Once the gas drive dissipated, movement of reservoir oil to the well bore ceased.

It was plaintiff's theory below, adhered to in this court, that in making the assessments for 1970 and 1971 the Rush county oil and gas assessor had ignored these known factors of productive well life in the area, which he characterized as initial high production, ensuing sharp decline, and short-lived wells. He points to K. S. A. 79-331, which requires an assessor of oil and gas leases to take into account, among other things, "the probable life of the wells."

He then relies on *Garvey Grain, Inc. v. MacDonald*, 203 Kan. 1, 453 P. 2d 59, in which we held that where the legislature has "detailed the factors or combinations thereof to be considered by taxing officials" in assessing property, "State and local taxing officials may not ignore the standards prescribed, since the statute clearly requires consideration of the pertinent factors to specific property and of an assessment of specific property in conformity with its provisions. It requires no semantic niceties to conclude that consideration of the pertinent factors is mandatory to determine justifiable value." (Id., p. 10.)

It is defendants' position, on the other hand, that this case involves merely a difference of opinion over value, where the good faith judgment of the assessor must prevail. They rely on *Cities Service Oil Co. v. Murphy*, 202 Kan. 282, 447 P. 2d 791, where we held:

"Generally, the only function of a court in matters of assessment is to make certain that a taxpayer has the benefit of the honest judgment of the assessing officers and unless the assessment is proven to be so out of proportion as to give reasonable assurance that officers could not have been honest in fixing its valuation, interference by courts is not justified."

"In the absence of evidence that an assessment was arrived at fraudulently, arbitrarily or capriciously, a difference of opinion as to value is no reason for interference by a court." (Syl. ¶ 2 & 3.)

The issue presented to the trial court, then, was whether this was a case of a mere difference of opinion (*Cities Service*), or one of ignoring a statutory factor of value (*Garvey*). The trial court found it was the latter, and we are called upon to determine whether that finding was correct.

The trial court made detailed and extensive findings of fact (67 in all) reviewing the evidence in general and as it related to each of the seven leases. No particular finding is challenged by the defendants, and only a few need be reproduced here. The court found that all leases in the area had a history of rapid decline in production after the first few months, which exceeded 50% in the second year. The assessor had employed a valuation schedule prepared by Dr. Charles F. Weinaug of the University of Kansas and adopted in its manual by the property valuation department. (The "Weinaug" schedule is discussed and generally approved in *Cities Service Oil Co. v. Murphy*, supra.) This schedule contains factors designed to account for production declines up to 50%. The court went on to find:

"16. The state manual is a useful tool in effectuating the statutory mandate that oil reserves should be assessed at 30% of value, if it is properly applied to realistically estimate the value of the reserves. *Where it is evident that production will rapidly decline, appropriate application of decline factors is essential to give a fair evaluation of a producing oil lease.* If such appropriate decline factors are not used in instances wherein rapid decline occurs, it will result in arbitrarily excessive valuation of the lease based on oil reserves which are non-existent." (Emphasis added.)

It also found that the data reflecting actual production for each lease, reflecting the rapid decline, had been furnished to the assessor in time for his consideration in making both the 1970 and 1971 assessments.

These general findings were followed by detailed findings as to each of the seven leases in question, concluding as to each that the assessor had either ignored altogether the manual's provisions for rapidly declining production, or had applied a decline factor based on an assumed production which was substantially higher than the known actual production.

After its lease-by-lease findings, the court summarized:

"62. In summary, the uncontradicted evidence discloses that the assessor made a fictional assumption that production from the leases would continue for years at a relatively constant rate. He did not consider and apply the factual data showing the rapid declines in production which occurred and

were occurring. Taxpayer had drilled about 150 wells in four townships of Rush County in this area, and had drilled 13 Lansing oil leases capable of some oil production in the immediate area, as of January 1, 1970. This was virtually all the Lansing oil production in the county. The assessor had no petroleum production or engineering experience, and so admitted. But in assessing the leases he ignored undisputed, completely documented facts showing the rapid decline. The information available on the 13 leases was presented to the assessor. As of January 1, 1970, the producing history on 5 of them had closed, all showing rapid decline in a few months or less, with a total productive life before plugging from one month to 19 months. The Urban G had declined from 5,635 barrels in March, 1968, to 1,948 barrels in January, 1969, (despite two new wells drilled in May and October, 1968), to 977 barrels in December, 1969. The Stremel, Buxton and Basgall B each had proved that production would rapidly decline in a few months from a new well or new zones in a well. The remaining four leases (Burgardt A, Basgall C, Urban J and Lippert A) had produced only three or four months in late 1969, so that it was inevitable that such leases would rapidly decline (as they did) during 1970. In May, 1970, when taxpayer requested consideration of the fact the leases would rapidly decline, the leases were in fact at that moment rapidly declining far below the levels which the assessor arbitrarily assumed would produce for years at a higher rate of production than was then occurring. Taxpayer presented detailed production graphs and all other information to the assessor. The assessor had no basis for his assumption.

"63. The corrected rendition by plaintiff for 1970 and 1971 fairly represent 30% of a fair market value. (Prior findings; Angle).

"64. The valuations testified to by defendants' engineering witness admittedly assumed a relatively stable production for 5 years. (Nicodemus). As such, the refusal to recognize the known rapid decline in all new production in the area after a few months' time, or less, renders such valuations useless. To ignore these known facts; and to base assumptions on general state averages which are not applicable to these leases, must be considered arbitrary because they are not based on recoverable reserves and ignore the actual productive life of the leases.

"65. All pertinent facts proved, and the assessor knew when he made his 1970 assessments, that all the leases involved were then rapidly declining, that none of them were even making state allowables, and that the leases would continue to rapidly decline during 1970. Nevertheless, on the Burgardt A, Basgall C, Basgall B, Urban J and Lippert A leases, the assessor arrived at values based upon the assumption that such wells would make far in excess of their allowables for 18 months after January 1, 1970, and would continue to make allowables for a period of five years (based on the value factor and barrels he used). On the other lease (Urban G) he also used high production figures based on prior year's production when such lease was rapidly declining and he knew it. (See finding No. 43). The assessor did not give consideration to the sharp anticipated decline, and did not apply the state manual provisions applicable thereto, and admits that he did not do so. The valuation made in disregard of the actual facts pertinent to value also necessarily failed to give consideration to the actual productive life of these leases.

"66. All pertinent facts available at the time of the 1971 assessment showed a continuing rapid decline. As to 1971, the assessor on all leases, except the Urban J, failed to give effect to the known extent of decline in production, and thus failed to give consideration to the actual productive life of these leases.

"67. By 1972, most of the production involved had become economically marginal, and the low production leveled out at a small rate of production. Plaintiff has testified that the 1972 assessments by the assessor on these leases were about the same as his renditions. This has resulted because the production has now leveled out at a low but relatively constant rate, and further sharp declines are no longer possible. The fact that the assessments by the assessor dropped from extremely high values to nominal values within two years is no evidence that the leases are presently being undervalued by the assessor. Rather, this fact indicates that the assessments initially were arbitrarily excessive, being based on assumed constant high production, when rapid decline was obvious from the known facts."

In its conclusions of law the trial court took notice of the assessor's duty to consider the "probable life of the wells" under K. S. A. 79-331, and went on to say:

"8. The value of oil and gas leases (aside from equipment value) rests primarily upon the amount of economically recoverable reserves, and the time it will take to recover them. This in turn depends upon the rate of production during the productive life of the lease.

"9. Because of differences in characteristics of oil reservoirs, the producing history of wells from the same or similar producing reservoirs on, and in the area of, the assessed lease must be considered in arriving at the recoverable reserves and the productive life of the lease. Application of state averages involving other types of formations and oil reservoirs, which are not comparable to the leases being assessed, must be considered arbitrary.

"10. The state schedules for 1970 and 1971 are useful tools in effectuating the statutory mandate requiring a determination of 30% of reasonable and fair value, provided they are applied so as to give appropriate effect to anticipated rapid decline in production, and to realistically estimate actual reserves on a fair basis. If used to estimate future reserves and production *based on constant production for a period of years, when all facts are contrary to that assumption, the resulting assessments necessarily ignore the statutory factors required to be given effect as to each lease,* and are thus arbitrary and invalid as a matter of law. See *Garvey Grain, Inc. v. MacDonald,* 203 Kan. 1, 13. The assessment is invalid and illegal, even though made in good faith. *Garvey Grain, Inc. v. MacDonald,* 203 Kan. 1, at 13.

"11. *Since the assessor admitted he had not given effect to the anticipated rapid decline in production on these leases, and the uncontradicted evidence showed that his valuations were predicated on constant, nondeclining production, contrary to the known and undisputed facts,* the assessments in question must be held invalid. In those few instances where the assessor considered some decline in production *he ignored the actual rate of decline in production* so as to arrive at a higher valuation. Such assessments must also be held

arbitrary and invalid because they failed to give effect to the actual facts then known. A method of valuation based solely on barrels of oil produced during part of a preceding year, without reference to other pertinent facts affecting market value, is 'unquestionably void.' *Richardson v. State*, 53 S. W. 2d 508, at 510 (Tex.)." (Emphasis added.)

The result was the judgment appealed from, finding five of the wells overvalued in both 1970 and 1971, one well in 1970 alone and another in 1971 alone.

In their statement of points defendants, as noted above, make no attack on any particular finding of fact. They do assert generally that "It was error to find the assessor failed to give consideration to known production decline in making his assessments for the year of 1971." We assume that assertion is based on the testimony of the assessor that for 1971 "he did take into consideration the decline factors, according to the schedule." However, he also testified that the manual was not designed to—and he did not—take into account declines of over 50%, which was the actual experience of these leases. Lip service to a legislative mandate is not enough. Cf. *Garvey Grain, Inc. v. MacDonald,* supra, 203 Kan. at 14. We conclude that the trial court's findings that the assessor did not give appropriate consideration to the probable life of the wells is supported by the record.

This conclusion effectively answers defendants' arguments, advanced in their brief, that (1) "The assessor was not arbitrary or capricious;" (2) "Appellee was arbitrary in disregarding his production history of prior years;" and (3) "Appellee has failed to prove constructive fraud." Once it is determined *as a matter of fact* that the assessor has failed to give proper consideration to a statutory element of value, under *Garvey* there is arbitrary and capricious action amounting to constructive fraud, regardless of the subjective good faith of the assessor.

Defendants also argue that "Appellee seeks to avoid paying his fair share of taxes." They base this on the idea that where an operator rapidly depletes the reserves under his lease "most of his oil escapes taxation while the operator following the normal procedure pays a tax on each barrel produced." We think this argument mistakes the incidence of the tax. What is assessed is the *lease,* not the oil produced. Production is merely one gauge by which the value of the reservoir, and in turn the lease, is measured. It is apparent that a reservoir which has been largely

drained as of a particular January 1, has less value than one which has not. The trial court answered this argument in its letter opinion:

". . . The plaintiff possibly produced the wells too rapidly; but this practice, if unsound, is to be corrected by an agency, (probably KCC), which is set up for that purpose and not by the [county] Commissioners. The assessment is made 'as of January 1.' It is of personal property. When it is excessive and known to be by the assessor, it is wrong to use the excessive value and excuse its excessive assessment use by saying that it will be too low next year. Dr. Weinaug's schedule is a careful and well-considered one; but it does not allow for unusual operators, such as Mr. Angle; and it really can't, as it would be too involved if it did. The taxing authorities must accept Mr. Angle and his oil properties as they really are 'as of January 1.' Anything else would be arbitrary and wrong."

Finally, defendants argue that "The trial court's decision is bad precedent and public policy." By this contention they suggest once again that the trial court substituted its opinion for that of the assessor. If this were so they would, of course, be right, and the judgment could not stand. Judicial intervention of that kind in the assessment process is prohibited by *Cities Service* and a host of other cases. But we have pointed out above that this is not that kind of a case. The trial court found *as a matter of fact* that in exercising his judgment the assessor deliberately ignored a statutory element of value. That finding is essentially unchallenged, and is supported by the record. The case, therefore, falls into the mould of *Garvey,* not that of *Cities Service.*

The judgment is affirmed.

APPROVED BY THE COURT.