No. 77,111

Board of County Commissioners of Ness County, Kansas, *Appellant,* v. Bankoff Oil Company, *Appellee.*
(960 P.2d 1279)

Opinion filed July 10, 1998.

*Larry D. Tittel*, county attorney, argued the cause and was on the brief for appellant.

*Thomas M. Rhoads*, of Glaves, Irby and Rhoads, of Wichita, argued the cause, and *Jack Glaves*, of the same firm, was with him on the briefs for appellee.

*Donald P. Schnacke*, of Donald P. Schnacke, P.A., of Topeka, was on the brief for *amicus curiae* Kansas Independent Oil and Gas Association.

The opinion of the court was delivered by

LARSON, J.: This first impression case raises important questions concerning the assessment methods of valuing oil and gas leases for ad valorem property tax purposes in Kansas.

## Procedural Summary

Bankoff Oil Company (Bankoff) paid its 1993 taxes on an oil and gas lease in Ness County under protest pursuant to K.S.A 79-2005 and commenced proceedings before the Board of Tax Appeals (BOTA), requesting substantial decreases in the valuation of the lease and a resulting refund of property taxes. After an initial hearing, BOTA declined to change the valuations and ruled in favor of Ness County.

Bankoff requested reconsideration, and, in a three-to-two reconsidered opinion, BOTA ruled that when an oil and gas lease began evidencing a production decline in the last quarter of the year previous to the assessment period, production data generated after January 1 of the year of appraisal was properly used to determine the correct decline rate of the lease. A decline rate was established which resulted in a decreased valuation and resulting tax refund.

Ness County filed a petition for judicial review of BOTA's action pursuant to K.S.A. 77-601 *et seq.* The trial court ruled BOTA's reconsidered order was supported by substantial competent evidence and that Ness County failed in its burden of proving grounds existed for overruling BOTA's decision under K.S.A. 77-621.

Ness County appealed, and the Court of Appeals, in a two-to-one decision, reversed the trial court, holding usage of production information generated subsequent to January 1 of the assessment year violates the requirements of K.S.A. 79-301 that personal property be assessed as of that date. The Court of Appeals invalidated provisions of the 1993 Kansas Oil and Gas Appraisal Guide of the Division of Property Valuation of the Kansas Department of Revenue (Guide) and ordered the district court to reinstate the original BOTA decision. *Board of Ness County Comm'rs v. Bankoff Oil Co.*, 24 Kan. App. 2d 532, 949 P.2d 628 (1997).

The dissenting opinion stated the majority had abandoned the strong presumption of correctness of agency actions, would force implementation of a new assessment system that is less reliable and sometimes erratic, and had denied usage of the best available information in determining the true value of an oil and gas lease. 24 Kan. App. 2d at 540-41.

We granted Bankoff's petition for review. We reverse the Court of Appeals and affirm the district court.

*Factual Statement*

While the foregoing summary generally establishes the issue before us, a more detailed statement is required to present the factual information relating to the oil and gas lease and the manner in which its valuation was established.

Bankoff operates two wells on the Linden oil and gas lease (Linden Lease) in the Brownell field, producing oil from the Cherokee Sand formation in Ness County, Kansas. The discovery well was located on the Linden Lease, which has extremely high permeability resulting in substantial initial gas-driven production and an eventual high rate of decline.

The Linden Lease had not shown decline characteristics for the years 1989, 1990, and 1991, primarily due to restrictions of the production equipment utilized. The defining factual issue in this case is whether the Linden Lease commenced a characteristic decline in late 1992 or should be assessed with essentially no decline for that year.

K.S.A. 79-329 declares that oil and gas leases producing or capable of producing in paying quantities together with all equipment thereon are personal property and are to be assessed and taxed as such. Oil and gas leases are required to be listed for taxation as of January 1 of each year pursuant to K.S.A. 79-301, with the valuation to be filed on or before March 15 of each year as required by K.S.A. 79-306, and are subject to penalties if not filed on or before April 1 of each year under the provisions of K.S.A. 79-332a.

In February 1993, Bankoff filed the required statement for the Linden Lease, showing a production decline rate of 2 percent and a fair market value of $3,357,045, resulting in an assessed valuation at the 30 percent rate required by K.S.A. 79-1439(b)(2)(B) of $1,007,114. The Ness County Appraiser valued the lease at $3,361,222, with an assessed value of $1,008,367. This valuation resulted in a 1993 property tax assessment of $99,942.28.

Later in 1993, Bankoff determined their computer-generated ad valorem tax assessment program had not accurately reflected an actual decline in production beginning in the fourth quarter of 1992, which when compared to the first quarter of 1993 revealed a quarterly decline of 16 percent, representing an annualized decline in excess of 50 percent. Bankoff additionally compared the Linden Lease production with that from other leases in the Brownell field and production from the nearby Jolly field also producing from the Cherokee Sand formation, disclosing similar substantial declines.

Bankoff exercised its statutory prerogative of paying the 1993 taxes under protest and applied to BOTA for a refund as allowed by K.S.A. 79-2005, thereby initiating the proceedings appealed from in this case.

The ultimate factual question involved in this appeal is the appropriate 1993 valuation of the Linden Lease. The procedure by which this is determined was best described by John R. Cooper, manager of the oil and gas section of the Division of Property Valuation of the Kansas Department of Revenue, at the reconsideration hearing where he responded to the following question:

"Q. On established production, that is other than new production, what methodology does the guide provide for arriving at market value for an oil lease?

"A. Well, the theory of the guide is that we are appraising the reserves that are in the ground. And so the guide, the basic mechanics of the guide is to discount income over a period of time to reflect the production capabilities of that reserve. And then it combines with that a rate of decline which is indicating that that reserve is depleting. That is combined with a discount, discounting the money— for the money that is not received until a later time. You get a present worth factor, which is a multiple of money, and that's multiplied times the value, or price of the oil, times the production; and that's to indicate a probable reserve value, from which is deducted the expenses for lifting the oil, to get a net working interest. Then they add the equipment, production equipment, to that, for the working interest. So it's based on the probable life of the reserve, and the probable dollars per barrel that will be received by the operator, or the working interest."

A mass appraisal technique has been developed for valuing oil and gas leases in Kansas by the Director of Property Valuation, with advice and input from a committee consisting of representatives of the oil and gas industry and county assessors. The Director, as provided by K.S.A. 75-5105a, issues appraisal guides directing that valuations of oil and gas leases shall be determined by utilizing the following formula to compute gross reserves:

| 1. Total Amount (Bbls.) Production | x | 2. Net Price as of Jan. 1 | = | 3. Estimated Gross Income | x | 4. Present Worth Factor | = | 5. Estimated Gross Reserve Value |
|---|---|---|---|---|---|---|---|---|

As the other items in the formula are relatively fixed, the critical factor is the present worth factor (PWF). The PWF is defined in section VI of the Guide as

"dependent on the discount rate and the duration of income. The value of money (income) [varies] with the time necessary for its return, the cost of using it, its current and future purchasing power, and its availability. Money to be received in the future is not worth as much as money to be received today.

. . . .

"The PWF incorporates into the manual the life and performance characteristics based on the percentage rate of decline which is computed for each particular lease . . . ."

The PWF's for 1993 ran from 3.009 for a 5 percent decline, reduced to 2.087 for an 18 percent decline and ultimately went down to .780 for a decline in excess of 50 percent. It is apparent that the determination of the decline to be applied to the lease becomes the most critical factor in establishing its valuation.

The Guide makes the following statements relating to the determination of the nature and extent of the decline rate:

"II. DECLINE

"Producing a finite reserve results in a depleting asset. The rate of depletion is known as the decline rate. An oil reserve produced at its potential will theoretically begin to decline immediately. When a lease is new and just beginning its production, the decline rate is not known. The decline rate estimate depends on the age of the lease and cannot be predicted accurately until a reasonable length of time has passed. A history of the lease should be kept for this purpose.

. . . .

"No rules can be established to cover every facet. Decisions based on logical judgement and factual situations with similar leases in the general locale must prevail. If the lease operator or the appraiser annualizes production in any year, the annualized production shall not be used in any succeeding year to establish a percentage decline. Decline curves should be used to establish the decline.
"The following guidelines are recommended:

'A.   New Leases
"Use the first few months of production to establish the decline rate. If the first few months of production and all data available indicate no decline, it is suggested the appraiser consider the use of an assumed 30% annual decline rate and evaluate the property on this basis. This, however, is not automatic and is to be used only when the actual decline rate cannot be established. Use of a proven neighborhood decline rate may be considered appropriate after proper consideration for flush production, but only when the new well or wells are completed in the same reservoir. Requests for consideration of percentage decline above 30% or adjustments by the appraiser below 30% should be documented by production decline, water cut and/or gas oil ratio curves.

"Abnormal shape decline is usually found with initial production from newly completed wells on new leases, added wells on existing leases, and recompletions or workovers on existing leases. . . . A lease with initial 'flush' production will show an abnormal sharp decline followed by change in the decline rate to normal rate of decline. If the property shows a constant rate of decline after the 'flush' production, the appropriate present worth factor for that rate should be used with production annualized for the period reflecting the stabilized production period. . . . .

"For leases that are less than one year old and in cases where an annual decline rate cannot be calculated, compute the annual decline rate by using back-to-back quarters, such as prior year last quarter with current year first quarter, and convert to an annual decline by using the following table. Requests should be accompanied by decline curves for as much history as is available.

"Quarter Decline Annualized Table

Quarter % = Annual Decline %

| | |
|---|---|
| 5% | 19% |
| 7% | 25% |
| 8% | 29% |
| 10% | 34% |
| 15% | 48% |

"Example:

| 1992 last quarter: | Oct/Nov/Dec |
| | $800/750/725 = 2275$ bbls. |
| 1993 first quarter: | Jan/Feb/Mar |
| | $700/690/695 = 2085$ bbls. |
| Quarterly decline | = | $\dfrac{2275 - 2085}{2275} = 8\%$ |
| Annualized decline | = | 29% (from table) |

"This table should be used as a guide only since new lease declining 15% in the first quarter may continue at a sharp decline over the next 12 months, but may not decline as great as 48%.

"When adjustment is requested by the operator for obvious abnormal sharp decline, it should be supported by data not only for the prior year demonstrating this decline, but production for the year of assessment. A misapplication of the decline factor could result in extreme under or overappraisal of the lease.

"If the appraiser needs assistance in estimating the decline rate, refer the lease rendition to the Property Valuation Division.

"B.   Existing Leases

"To estimate the decline rate on an existing lease having stable production from year to year, the current year decline is figured by using the prior two production years. For the 1993 tax year, use 1992 and 1991 as follows:

$$\text{Decline} = \frac{\text{1991 Production - 1992 Production}}{\text{1991 Production}}$$

$$\text{Ex. } \frac{\text{1408 Bbls. - 1234 Bbls.}}{\text{1408 Bbls.}} = 12\%$$

"When using prior years' production to estimate the current year decline, the appraiser must be sure that the production figures are for a full year and represent a typical operation with no significant workover periods or lease shutdowns or other nonproducing periods effecting the lease producing capability."

In regards to the proper method of valuing the Linden Lease, the Court of Appeals' opinion in this case well summarizes the testimony from the initial BOTA hearing:

"At the initial BOTA hearing, Bankoff presented the testimony of Barney Sullivan, a tax consultant specializing in mineral properties. Sullivan stated that he had testified as an expert before BOTA many times and that he had been involved in the formulation of the PVD Guide. In calculating the decline rate of the Linden lease, Sullivan compared the last quarter of 1992 to the first quarter of 1993, arriving at a 16 percent decline for that period. Sullivan annualized this to a 50.2 percent decline. Sullivan's rationale for the decline calculations came from the PVD Guide, which Sullivan quoted as follows:
'For leases that are less than one year old *and in cases where an annual decline rate cannot be calculated,* compute the annual decline [rate] by using back-to-back quarters, such as prior year last quarter with current year first quarter, and convert to an annual decline by using the following table.' (Emphasis added.)

"Sullivan testified that this language applied both to new leases and to cases where an annual decline rate cannot be calculated and that the Linden lease fell under the second application. Sullivan testified further that it was 'absolutely inappropriate' to use a comparison of the prior 2 years where a lease has a considerable decline. Sullivan agreed that if the decline rate on the Linden lease is figured by comparing the production in 1991 to that in 1992, then a 2 percent decline rate is indicated.

"Bankoff also presented the testimony of Richard J. Flaker, a consulting petroleum engineer. Flaker testified that there are 14 wells in the Brownell field and that they all pump oil from a common source. Using exhibits and charts, Flaker showed that although production at Brownell field reached a sharp peak in August 1992, the Linden lease wells had a flat production from 1990 through October 1992. Flaker testified further that the Linden lease wells would have peaked with the rest of the Brownell field had they not been mechanically limited.

"Flaker compared Linden lease's production for the last quarter of 1992 to the first quarter of 1993 and arrived at a 16 percent decline for that period. Flaker utilized data from the entire Brownell field as well as a similar field, known as the

Jolly field, in determining the reasonableness and appropriateness of the 16 percent decline rate." 24 Kan. App. 2d at 535-36.

"[T]he county appraiser testified that in determining the amount of decline, she looks at both the annual and historic decline. The decline curve that the county appraiser plotted on the Linden lease from its beginning in 1989 through the end of 1992 did not show a decline. The county appraiser compared the Linden lease's production in 1991 to that in 1992 and arrived at a 2 percent decline. At some point, the county appraiser examined the production figures for the first quarter of 1993; however, she testified that this information would not have changed her calculation because she had seen oil leases suffer a decline and then go back up and stabilize.

"In a letter to BOTA dated August 29, 1994, the county appraiser stated: 'When I work the present year renditions I do consider the first quarter of that year since it is available and it can indicate change, but at this point this lease had no indication of a fall in production.'" 24 Kan. App. 2d at 535.

BOTA affirmed the county's appraiser's assessment following this initial hearing, and its order dated October 12, 1994, in applicable part, stated:

"The county properly valued the subject property using the guidelines as established by PVD. The taxpayer argues that the PVD guidelines indicate that the county can use post valuation . . . data to value the property. The Board notes that the guidelines state that post valuation data may be used only in cases where the annual decline rate cannot be accurately calculated or if the lease is new. Here, the subject property has been producing oil for three full years prior to the valuation date and a reliable production history had been established. The production history indicated that production had been fairly stable over the three year period and the county used the information available as of January 1, 1993, to value the property. Therefore, the county was not in error to refuse the taxpayer's request to use production data obtained after January 1, 1993. Furthermore, to deviate from the guidelines and value the subject property differently than other similar property in the area would violate the uniform and equal clause of the Kansas constitution. To explain, existing oil leases in the county should be valued as of January 1, 1993, using production information obtained in 1991 and 1992. If the county were to use 1993 production for this one lease only, then would be valued differently than the other leases in the county and thus, not uniform and equal."

Bankoff filed a petition for reconsideration, contending BOTA failed to consider the significant and permanent decline of production from the Linden Lease commencing in October 1992, as well as evidence of the county appraiser's allowing substantial declines in valuing other leases in the same Brownell field.

BOTA granted the petition for reconsideration. At the second hearing, Richard Flaker again testified substantially as he had previously done. He stated the Linden Lease reached its peak production in June 1992, that its decline was apparent commencing October 1992, and that it experienced a 16 percent decline in the last quarter of 1992 compared to the first quarter of 1993, which should be annualized for a decline of 50 percent. This would result in an assessed 1993 valuation of $165,805, a correct property tax of $16,433, and a tax refund of approximately $83,000.

Bankoff also presented evidence that the county appraiser had allowed a 30 to 50 percent decline on all of the other oil and gas leases in the Brownell field adjacent to and around the Linden property.

Other new testimony presented at the reconsideration hearing was that of Cooper, the person primarily responsible for drafting the Guide. Cooper testified generally as to the application and usage of mass appraisal techniques to determine oil and gas lease values throughout the state. He indicated the Guide was not meant to limit the use of comparing the last quarter of the preceding year to the first quarter of the current year to new leases only. He stated his office recommended using the data from the first quarter of the current year if a sharp decline is indicated that otherwise would not be evidenced by comparing the previous 2 years. Because the Linden Lease took on the characteristics of a new lease due to a sharp decline commencing in October 1992, in valuing the property for 1993 he would annualize the first 3 months of 1993 production to compute the proper decline rate.

Cooper testified that the Guide's method of considering the two prior years in valuing leases was only useful in cases of stabilized production, but that method did not appropriately value other leases. Cooper said that an additional recognized method of calculating decline was to look at the field where the lease in question was located generally and then compare that data to the lease in question. Cooper specifically stated:

"[W]henever these production numbers start changing, . . . it would certainly indicate one of two things; one, that the price of oil dropped, and they started slowing down production; or that some decline started showing up. Its natural

production was starting to slow down. So it would be an obvious question to ask, if it was pointed out—not all of these returns that are provided to the county, not all of the operators provide the first three months. So when, people—when the counties call us, we say, 'get the first three, and even the first four, if you can, and see what is happening there now.' And then we have advised in the past to take the first three or four months and annualize that as the production to look for, for the next 12 months, and combine that with some kind of decline."

As to the Linden Lease, Cooper did not opine a specific decline, but in comparison to the other fields, stated: "[I]f the field has a fifteen to twenty percent decline, that would certainly be a place to start."

Ness County contended that no change in the valuation should be made and requested reissuance of the order previously entered. The county's evidence remained the same at the reconsideration hearing as at the previous hearing.

Bankoff continued to make a uniform and equal argument, asserting that because most of the other leases in the same field had been given declines from 30 to 50 percent and the Linden Lease had not been likewise treated, it was being unfairly and unequally assessed.

In BOTA's reconsidered order dated June 28, 1995, the testimony of Cooper was given prime emphasis. The order stated:

"6. . . . [T]he various methods described in the Guide are alternatives which should be selected on the basis of which is the most appropriate and not where they are found in the Guide; . . . and that for eighteen years he has been advising county appraisers to consider available data even up to June or July of the current year when taxpayers questioned the appraisal (even though the appraisal date is January 1).

. . . .

"8. . . . The evidence also shows that the Ness County Appraiser does consider current year production. In regard to this appeal, and the appraiser, Judy Humberg, wrote to the Board a letter dated August 29, 1994, stating:

'When I work the present year renditions I do consider the first quarter of that year since it is available and it can indicate change, but at this point this lease had no indication of a fall in production.'

"9. After a review of all the evidence, the Board finds that using alternative methods of computing decline rates (including the consideration of current year production) has been advised by PVD for many years and is a common practice among appraisers, including the Ness County Appraiser. Accordingly, the Board

finds the use of such techniques in this case does not violate the constitutional requirement of a uniform and equal basis for valuation.

"10. The Board has examined the production figures presented in Taxpayer Exhibit #3. Oil production in the last quarter of 1992 totaled 20,024 barrels while production for the first quarter of 1993 totaled 16,505 barrels. This is a decline of approximately 18%. Had the county taken into account production as late as June or July, as advised by John Cooper, the decline would have been greater. The Board finds, in this instance, the county did have an indication of a fall in production and should have used available information to calculate an accurate decline rate.

. . . .

"12. The Board, in this case, finds the most appropriate method for computing the decline rate of the subject property is the suggestion by Mr. Cooper to annualize the 1993 first quarter production and compare the result with the previous year's production. Using the production figures in Taxpayer Exhibit #3, the Board calculates a total 1992 production of 80,390 barrels and a 1993 first quarter annualized production of 66,020 barrels. The annual 1993 production falls approximately 18% below the 1992 production, resulting in an 18% decline rate. This is the same decline rate arrived at if figured from the back to back quarters using the last quarter production of 1992 (20,024) and the first quarter of 1993 (16,505).

"IT IS THEREFORE, BY THE BOARD OF TAX APPEALS OF THE STATE OF KANSAS, CONSIDERED AND ORDERED that for the 1993 tax year, the subject property shall be assigned a decline rate of 18%."

Two of BOTA's members dissented from this reconsidered opinion, writing: "It appears that we are using 1993 figures to calculate a decline when we should be using only 1990, 1991, and 1992, production figures. . . . We feel the county appraiser had correctly evaluated the rate of decline, and so we would sustain the county's value."

Upon Ness County's appeal, the district court held there was substantial competent evidence to support BOTA's reconsidered decision and that Ness County had failed to prove adequate grounds for a reversal.

In reversing, the Court of Appeals centered its opinion on the K.S.A. 79-301 provision that personal property subject to taxation shall be assessed as of January 1 of each year. The court held the Guide was in conflict with such statutes and therefore invalid. The practice of using data beyond the January 1 assessment date was thereby prohibited. 24 Kan. App. 2d 539-40.

We granted Bankoff's petition for review in order to settle the divergent views of BOTA and the Court of Appeals.

*Standard of review*

Our standard of review of the actions of BOTA is pursuant to K.S.A. 77-621(c). *In re Tax Appeal of Boeing Co.,* 261 Kan. 508, 514-15, 930 P.2d 1366 (1997). We may only grant relief if we find:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

. . .

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

. . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which included the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

In *Boeing,* we said: "BOTA is a specialized agency that exists to decide taxation issues. BOTA's decisions should be given great deference when it is acting in its area of expertise. However, if we find that BOTA's interpretation is erroneous as a matter of law, we should take corrective steps." 261 Kan. 508, Syl. ¶ 3. A party challenging the validity of BOTA's action has the burden of proving it was erroneous. *In re Tax Appeal of Scholastic Book Clubs, Inc.,* 260 Kan. 528, 536, 920 P.2d 947 (1996).

While our ultimate result will depend upon the principles set forth above, we must first answer a critical question of statutory construction relating to the effect of K.S.A. 79-301, which is a question of law over which we have unlimited review. *Miami County v. Svoboda,* 264 Kan. 204, Syl. ¶ 1, 955 P.2d 122 (1998). In interpreting the applicable statutes, we look to the rules set forth in *Todd v. Kelly,* 251 Kan. 512, 515-16, 837 P.2d 381 (1992):

"The function of the court is to interpret the statutes, giving the statutes the effect intended by the legislature. *State ex rel. Stephan v. Kansas Racing Comm'n,* 246 Kan. 708, 719, 792 P.2d 971 (1990).

"'As a general rule, statutes are construed to avoid unreasonable results. *Wells v. Anderson,* 8 Kan. App. 2d 431, 659 P.2d 833, *rev. denied* 233 Kan. 1093 (1983). There is a presumption that the legislature does not intend to enact useless or meaningless legislation. *In re Adoption of Baby Boy L.,* 231 Kan. 199, Syl. ¶ 7, 643 P.2d 168 (1982).' *City of Olathe v. Board of Zoning Appeals,* 10 Kan. App. 2d 218, 221, 696 P.2d 409 (1985).

"'A construction of a statute should be avoided which would render the application of a statute impracticable or inconvenient, or which would require the performance of a vain, idle, or futile thing, or attempt to require the performance of an impossible act.' *In re Adoption of Baby Boy L.,* 231 Kan. 199, Syl. ¶ 8, 643 P.2d 168 (1982). See 73 Am. Jur. 2d, Statutes § 251.

"'In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible.' *In re Marriage of Ross,* 245 Kan. 591, 594, 783 P.2d 331 (1989).

"'[T]he court must give effect to the legislature's intent even though words, phrases or clauses at some place in the statute must be omitted or inserted.' *Ross,* 245 Kan. at 594.

"'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia. . . .' Kansas Commission on Civil Rights v. Howard,* 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975)."

## Analysis

In Kansas, oil and gas leases are assessed and taxed as personal property for ad valorem taxation. K.S.A. 79-329; *Mobil Oil Corporation v. McHenry,* 200 Kan. 211, 224, 436 P.2d 982 (1968). K.S.A. 79-301 provides:

"All tangible personal property subject to taxation shall be listed and assessed as of the first day of January each year in the name of the owner thereof. Such listing and assessment shall be made as hereinafter provided."

K.S.A. 79-501 and K.S.A. 79-1439(a) require personal property subject to ad valorem taxation to be appraised uniformly and equally at its fair market value. Fair market value is defined by K.S.A. 79-503a as

"the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1.

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

. . . .

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

. . . .

"(f) productivity;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period; [and]

. . . .

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes.

"The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures which are adaptable to mass appraisal and consistent with the definition of fair market value unless otherwise specified by law."

## K.S.A. 79-505 directs:

"(a) The director of property valuation shall adopt rules and regulations or appraiser directives prescribing appropriate standards for the performance of appraisals in connection with ad valorem taxation in this state. Such rules and regulations or appraiser directives shall require, at a minimum:

(1) That all appraisals be performed in accordance with generally accepted appraisal standards as evidenced by the appraisal standards promulgated by the appraisal standards board of the appraisal foundation which are in effect on March 1, 1992; and

(2) that such appraisals shall be written appraisals.

"(b) The director of property valuation or a county appraiser may require compliance with additional standards if a determination is made in writing that such additional standards are required in order to properly carry out statutory responsibilities."

## K.S.A. 79-331 sets forth requirements for appraising the value of oil and gas leases. It reads:

"(a) Except as otherwise provided in subsection (b) of this section, in determining the value of oil and gas leases or properties the appraiser shall take into

consideration the age of the wells, the quality of oil or gas being produced therefrom, the nearness of the wells to market, the cost of operation, the character, extent and permanency of the market, the probable life of the wells, the quantity of oil or gas produced from the lease or property, the number of wells being operated, and such other facts as may be known by the appraiser to affect the value of the lease or property.

"Whenever a county board of equalization or the state board of equalization shall make a change in any of the factors or figures used in determining the eight-eighths (8/8ths) valuation of the production for any oil or gas lease or property, such change shall apply to the working interest, royalty interest, overriding royalty interest and production payments.

"(b) The valuation of the working interest and royalty interest, except valuation of equipment, of any original base lease or property producing oil or gas for the first time in economic quantities on and after July 1 of the calendar year preceding the year in which such property is first assessed shall be determined for the year in which such property is first assessed by determining the quantity of oil or gas such property would have produced during the entire year preceding the year in which such property is first assessed upon the basis of the actual production in such year and by multiplying the income and expenses that would have been attributable to such property at such production level, excluding equipment valuation thereof, if it had actually produced said entire year preceding the year in which such property is first assessed by sixty percent (60%).

"(c) The provisions of subsection (b) of this section shall not apply in the case of any production from any direct offset well or any subsequent well on the same lease."

K.S.A. 79-331(b) provides that production from a new well which is the first on a lease shall be discounted in order to reflect the decline in "flush production" which will occur in subsequent years so as to better assess the proper value of its future production. This subsection compels appraisers to anticipate a decline in production, even though no decline is apparent from a lease's prior production history. See *State ex rel. Stephan v. Martin*, 230 Kan. 747, 756-57, 641 P.2d 1011 (1982).

In approving the constitutionality of K.S.A. 79-331(b) in *State ex rel. Stephan v. Martin*, 230 Kan. at 756-57, we stated that the provision was enacted in order to address a problem of ad valorem tax valuation peculiar to the oil and gas industry. Without such a provision, we noted the production value of a new lease would be greatly inflated, resulting in excessive valuation and assessment. We held that the objective under both 79-503a and 79-331 "is to reach

the actual fair market value in the market place as opposed to a fictional, unrealistic, or arbitrary determination." 230 Kan. at 755. While not specifically so stating, this decision in effect upheld the entire statutory method of valuing oil and gas properties.

To support our holding in *Martin,* we quoted from the trial court's findings of fact set forth in *Angle v. Board of County Commissioners,* 214 Kan. 708, 712-13, 522 P.2d 347 (1974):

" ' "Since the assessor admitted he had not given effect to the anticipated rapid decline in production on these leases, and the uncontradicted evidence showed that his valuations were predicated on constant, nondeclining production, contrary to the known and undisputed facts, the assessments in question must be held invalid. In those few instances where the assessor considered some decline in production he ignored the actual rate of decline in production so as to arrive at a higher valuation. Such assessments must also be held arbitrary and invalid because they failed to give effect to the actual facts then known. A method of valuation based solely on barrels of oil produced during part of a preceding year, without reference to other pertinent facts affecting market value, is 'unquestionably void.' *Richardson v. State,* 535 S.W.2d 508, at 510 (Tex)." ' " 230 Kan. at 757.

A reading of *Angle* would appear to uphold the usage of all available valuation information, whether post or prior to January 1, although such was not the primary issue in that case.

Ad valorem taxation of oil and gas leases differs from that of most other personal property in that the assessment is based on the present worth of the lease's future production. The determination of the fair market value of a lease necessarily requires consideration of the expected future income potential of a lease, including the age and probable life of producing wells thereon. This methodology primarily arose out of the efforts of Dr. Charles F. Weinaug, a professor of petroleum engineering at the University of Kansas and a consultant to the Kansas Department of Revenue. This method was approved by our court in *Cities Service Oil Co. v. Murphy,* 202 Kan. 282, 447 P.2d 791 (1968).

The appraisal difficulties created by the flush production of a new lease are similar to the difficulties encountered when a lease begins a production decline late in the year preceding appraisal. The Guide developed by the Division of Property Valuation treats both incidents similarly, as the failure to properly calculate and confirm the decline rate of a lease would inaccurately reflect its

future production and result in an inaccurate valuation and assessment, just as the failure to account for flush production in a new well would.

It is obvious that production data pertaining to periods after January 1 is relevant to a determination of the property's future productivity and earning potential as of January 1, particularly when there have been significant changes in production late in the year prior to assessment. The Guide recognizes the significance of this data for tax assessments in the oil and gas industry, and this method of assessment is a generally accepted appraisal practice in the field.

Kansas statutes permit factual information acquired after January 1 to be used to alter the valuation of property. K.S.A. 79-1412a(b) allows the Director of Property Valuation to change or modify the guides, schedules, or methodology for use in valuing property as late as June 30 of any year. Cooper's testimony pointed out the oil price for valuation of leases has been adjusted on several occasions during the first half of the assessment year in order to better account for the future value of lease production. This is specifically allowed by K.S.A. 79-1412a(b) and is an example of using post-January 1 data and information to arrive at a fair and equitable valuation.

In addition, in K.S.A. 79-506, the legislature specifically adopted the Uniform Standards of Professional Appraisal Practice issued by the Appraisal Standards Board in effect on March 1, 1992. The *amicus curiae* points out that Appraisal Standard No. 3, adopted by the legislature, acknowledges that retrospective appraisals may be appropriate for property tax matters and permits appraisers to consider data subsequent to the effective date of appraisal to confirm trends which would have been considered by a buyer or seller as of the effective date in arriving at a retrospective value.

Although K.S.A. 79-503a states that fair market value is the amount a well-informed buyer is justified in paying and a well-informed seller is justified in accepting for property in an open and competitive market in a sale consummated on January 1, the application of this standard as required by the Court of Appeals myopically focuses on the single date involved and ignores the entire

appraisal process, along with numerous other statutory provisions brought into play.

For example, the listing of property during the first quarter of a tax year and the availability of appeals as to valuation is allowed by K.S.A. 79-1448 "within 30 days subsequent to the date of mailing of the valuation notice required by K.S.A. 79-1460 and amendments thereto, for real property, and on or before May 15 for personal property."

The provisions of K.S.A. 79-1460 relate to notification of taxpayers of the change in classification or appraisal valuation of property and state in applicable part:

"The county appraiser shall notify each taxpayer in the county annually on or before March 1 for real property and May 1 for personal property . . . of the classification and appraised valuation of the taxpayer's property . . . Such notice shall also contain a statement of the taxpayer's right to appeal and the procedure to be followed in making such appeal."

Real and personal property appraisals are to be completed by June 15 each year, K.S.A. 79-1466 and K.S.A. 79-1467, and the completed tax roll is to be certified by the appraiser to the county clerk. Under our ad valorem taxation scheme, the valuations are being reported, altered, tested, appealed from, and determined during essentially the first half of the tax year. An overview of the entire process and consideration of the numerous statutes makes it clear that all available appraisal information is to be utilized regardless of whether the data originated before, on, or after January 1 of the tax year.

The Court of Appeals erroneously granted the January 1 date of K.S.A. 79-301 exclusive status in the appraisal process and failed to give proper consideration to all of the other statutory provisions in the determination of the fair market value of the property. Allowing consideration of production data collected after January 1 when a lease suffers a decline late in the year conforms to generally accepted appraisal procedures in the oil and gas industry and is consistent with the definition of fair market value of K.S.A. 79-503a, despite the apparent incongruity with the statement that property is to be assessed as if a sale had been consummated on January 1.

Refusing to allow consideration of post-January 1 production data when assessing an oil or gas lease that has suffered a decline in production would be to ignore relevant and available factual information pertaining to the lease's future productivity and income. This result is not required by K.S.A. 79-503a, is contrary to assessment principles embodied in the statutory scheme, and denies the expertise wielded by the Director of Property Valuation in adopting the Guide.

BOTA did not erroneously interpret or apply the law in upholding the Guide's endorsement of the use of post-January 1 production data. Such Guides have been lawfully used throughout the years, are not in violation of Kansas statutes or regulations, and are approved. The decision of the Court of Appeals to the contrary is reversed.

With the validity of the Guide being upheld, we then look to see if any of the requirements of K.S.A. 77-621(c) require reversal of the majority decision of the reconsidered BOTA decision. We find they do not. There is substantial competent evidence to justify BOTA's decision, and none of the provisions of K.S.A. 77-621(c) require reversal. The trial court correctly upheld BOTA's reconsidered opinion, and its decision is affirmed.

Reversed and remanded with instructions to compute and order the refund to Bankoff required by the BOTA order.