NOT DESIGNATED FOR PUBLICATION

No. 114,593

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
WOOLSEY OPERATING COMPANY, LLC,
for the Year 2013 in Barber County, Kansas.

MEMORANDUM OPINION

Appeal from Board of Tax Appeals. Opinion filed September 30, 2016. Affirmed.

*Eric I. Unrein*, of Frieden, Unrein & Forbes, LLP, of Topeka, for appellant Barber County, Kansas.

*Steven D. Gough*, of Withers, Gough, Pike, Pfaff, and Peterson, LLC, of Wichita, for appellee Woolsey Operating Company, LLC.

Before POWELL, P.J., ARNOLD-BURGER, J., and WALKER, S.J.

POWELL, J.:  Woolsey Operating Company, LLC (Woolsey), has oil and gas leases in Barber County, Kansas (County). Because of the unique characteristics of the wells on some of these leases, the County decided to forego the standard methodology used to estimate the fair market value of oil and gas leases in Kansas and hired an outside expert to value the leases based upon certain deviations from the 2013 Oil and Gas Appraisal Guide published by the Kansas Department of Revenue's Property Valuation Division (2013 Guide). Woolsey also hired an independent expert to calculate the value of the leases, but Woolsey's expert based his value of the leases on the standard Kansas valuation methodology contained in the 2013 Guide. The difference between the two values was over $10 million. After conducting a 3-day hearing, the Board of Tax Appeals

1

(BOTA) essentially found that the County had not met its burden of proof in appropriately deviating from the 2013 Guide and establishing the proper market value of the leases, while also finding that Woolsey's values more accurately adhered to the 2013 Guide and, therefore, were more accurate in terms of estimating the market value for tax purposes. Not surprisingly, the County appeals, arguing BOTA made several errors in reaching its conclusion. Finding no reversible errors, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2013, the County's new appraiser, Karen Spencer, learned from the Oil and Gas Manager of the Property Valuation Division (PVD) of the Kansas Department of Revenue, Lynn Kent, that her predecessor had issued a number of "no change" notices regarding ad valorem tax valuations, even though many operators had not been given informal hearings. Spencer contacted each operator to resolve the disputes. She was able to successfully resolve all of the disputes except for those involving eight oil and gas leases operated by Woolsey. Those eight leases are Miller C, Ricke 4H, Ricke A, Spicer GU C2, Tucker B5H, Weckworth, Wiley Trust 1 & 2, and Vogel. The wells on the leases were all drilled in the Mississippian Formation using the slick water fracking technique.

Spencer realized while trying to resolve the disputes that the eight leases had characteristics not typical of other oil and gas leases. Specifically, the leases' wells appeared to demonstrate hyperbolic, instead of the more typical exponential, rates of decline. Hyperbolic rates of decline show high rates of decline initially, which then level off to more gradual rates of decline, while exponential rates of decline have consistent rates of decline. Woolsey's wells also seemed to display high initial operating costs which decreased as production decreased. Spencer sought advice from Kent, who was aware that the 2013 Guide—which she wrote, updated, and published—was not well suited for

2

use in appraising wells drilled in the Mississippian Formation using the slick water fracking technique because of their unique characteristics.

Kent informed Spencer that the County had a right under Kansas law to deviate from the 2013 Guide's valuation methodologies in determining a property's fair market value. Because the 2013 Guide assumed that most properties would experience exponential rather hyperbolic rates of decline, Kent believed the County was justified in deviating from the 2013 Guide to calculate the valuation of Woolsey's leases. Kent suggested that Spencer exercise the County's right to deviate from the 2013 Guide and contact an outside appraiser, specifically Kenneth Hitt of Capitol Appraisal Group, LLC. Hitt had reviewed the 2012 Guide for the Kansas County Appraiser's Association, using a discounted cash flow analysis to analyze whether the 2012 Guide fairly estimated the properties' fair market value. After conducting the review, he continued to work with Kent and PVD. Kent was confident that Hitt was qualified to value Woolsey's leases according to Kansas law.

Spencer contacted Hitt and asked him to complete a fair market value analysis on Woolsey's leases. Because of his review of the 2013 Guide, his communication and interaction with Kent and other PVD representatives, and his attendance at a 2013 Guide class conducted by Kent, Hitt was familiar with the Kansas standards for valuing oil and gas leases for ad valorem tax purposes. He applied a discounted cash flow analysis based on the hyperbolic decline curves submitted by Woolsey to calculate its leases' fair market value. To assist in the calculations, Hitt used a proprietary computer software program. When Hitt had finished determining the leases' fair market value, he discussed the results with Spencer, who shared the information with Woolsey and used it in preparing the leases' final renditions. The total appraised value was $14,826,038.

When Woolsey received the leases' final renditions, it noticed what it believed to be discrepancies in the calculations and filed a notice of appeal with BOTA for all eight

leases. It then hired its own expert, Gary Reed, to prepare renditions for the leases based on the 2013 Guide. Reed is a licensed professional engineer in the State of Kansas with a long history in the oil and gas industry and has prepared a number of renditions for oil and gas properties each year for about 20 years. His initial total value of the leases was $6,846,945. Then, after realizing that a prior case from this court and a case from our Supreme Court applied, he prepared updated renditions for two of the leases: Ricke 4H and Ricke A. As a result, the updated total value of the leases was reduced to $4,094,449.

In February 2015, BOTA held a 3-day hearing; several Woolsey employees, Reed, and Spencer testified for Woolsey. Spencer also testified for the County, as did Hitt and Kent. At the beginning of the hearing, the County objected to several of Woolsey's exhibits, mainly those depicting the change in valuation of the Ricke 4H and Ricke A leases. The County argued the change in valuation was an impermissible amendment to the prehearing order and was based on the improper use of post-valuation date production data. BOTA eventually admitted the exhibits, stating that it would later determine the appropriate weight to give each piece of evidence. On September 14, 2015, BOTA issued its written decision in favor of Woolsey.

In the order, BOTA began by addressing the evidentiary issue, finding that because the change in valuation of the Ricke 4H and Ricke A leases did not add any new parties, claims, or defenses, the updated renditions for those leases were allowed. It then determined that the County had just cause to deviate from the 2013 Guide because Woolsey initially provided hyperbolic decline curves; Spencer, Hitt, and Kent each concluded that the wells appeared to show hyperbolic decline characteristics; and the 2013 Guide was not suited to address the unique characteristics of slick water fracking wells. But BOTA also noted that even though it determined the County had just cause to deviate from the 2013 Guide, it did not mean the County's valuation methodology was the best indicator of the leases' value. Finally, BOTA concluded that because Hitt's calculations on behalf of the County were premised on an assumption that the wells'

4

water and chemical costs would decrease at a rate proportionate to the rate of decrease in oil production—an assumption which proved false, because Hitt's calculations included other errors, and because Reed's calculations on behalf of Woolsey followed the 2013 Guide, Woolsey's valuation methodology calculated in accordance with the 2013 Guide was the better indicator of the leases' value.

The County timely appeals.

### DID BOTA ERR IN FINDING THAT WOOLSEY'S VALUATION METHODOLOGY WAS THE BETTER INDICATOR OF THE LEASES' VALUE?

The County first claims that BOTA erroneously accepted Woolsey's valuation methodology.

Our duty is to review a decision from BOTA in the manner prescribed by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq*. We may grant relief pursuant to K.S.A. 2015 Supp. 77-621(c), the pertinent portions of which provide:

> "(4) the agency has erroneously interpreted or applied the law;
> "(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;
> . . . .
> "(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or
> "(8) the agency action is otherwise unreasonable, arbitrary or capricious."

5

On appeal, "[t]he burden of proving the invalidity of agency action is on the party asserting invalidity." K.S.A. 2015 Supp. 77-621(a)(1); see *Milano's Inc. v. Kansas Dept. of Labor*, 296 Kan. 497, 500, 293 P.3d 707 (2013).

The term "'in light of the record as a whole'" is statutorily defined to include the evidence both supporting and detracting from an agency's finding. K.S.A. 2015 Supp. 77-621(d). Thus, we must determine whether the evidence supporting BOTA's factual findings is substantial when considered in light of all the evidence. See *Sierra Club v. Moser*, 298 Kan. 22, 62-63, 310 P.3d 360 (2013). To uphold a BOTA decision, we must conclude that a reasonable person could accept the evidence as being sufficient to support the ruling. *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1114, 269 P.3d 876 (2012). To conclude that a BOTA decision lacked support of substantial evidence, we must conclude that the ruling was "so wide of the mark as to be outside the realm of fair debate." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 137, 275 P.3d 56 (2012).

With regard to questions of law, which include the proper interpretation of a statute, our standard of review is unlimited. See *In re Tax Appeal of LaFarge Midwest*, 293 Kan. 1039, 1043, 271 P.3d 732 (2012). Moreover, we no longer give deference to an agency's statutory interpretation. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010); *In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 471-72, 239 P.3d 96 (2010).

In *Helmerich & Payne, Inc. v. Board of Seward County Comm'rs*, 34 Kan. App. 2d 53, 55-56, 115 P.3d 149, *rev. denied* 280 Kan. 982 (2005), another panel of this court addressed the statutory guidelines and theory of oil and gas leasehold valuation for ad valorem taxation in Kansas:

6

"For purposes of valuation and taxation in Kansas, all oil and gas leases and wells are considered personal property. K.S.A. 79-329. Persons who own such personal property are required to file a statement of assessment on standard rendition forms on or before April 1 of each tax year. K.S.A. 79-332a. In practice, the county appraiser then reviews the taxpayer's rendition and determines whether changes to the valuation are required and thereafter notifies the taxpayer of the appraised value. See K.S.A. 2004 Supp. 79-1460. The county appraiser is obligated to follow the Oil and Gas Appraisal Guide (Guide) prescribed by the Director of Property Valuation but may deviate from the Guide on an individual piece of property 'for just cause shown and in a manner consistent with achieving fair market value.' K.S.A. 79-1456. In determining the value of such property, the appraiser must also consider statutory factors of value.

"'Except as otherwise provided in subsection (b) of this section, in determining the value of oil and gas leases or properties the appraiser shall take into consideration the age of the wells, the quality of oil or gas being produced therefrom, the nearness of the wells to market, the cost of operation, the character, extent and permanency of the market, the probable life of the wells, the quantity of oil or gas produced from the lease or property, the number of wells being operated, and such other facts as may be known by the appraiser to affect the value of the lease or property.' K.S.A. 2004 Supp. 79-331(a).

"Consideration of these statutory factors is mandatory; failure to take into consideration any of these statutory factors will invalidate the assessment. See *Garvey Grain, Inc. v. MacDonald*, 203 Kan. 1, 14-15, 453 P.2d 59 (1969). In the context of oil and gas valuation, failure to give consideration to known production decline in making an assessment may be considered inadequate consideration of the 'probable life of the wells,' thus rendering the assessment arbitrary, capricious, and void as a matter of law. *Angle v. Board of County Commissioners*, 214 Kan. 708, 713, 522 P.2d 347 (1974)."

As BOTA noted, resolving the valuation of the leases in question essentially requires a judgment as to the accuracy of the experts' calculations. Both used different valuation methodologies to calculate the value of the leases. The difference in the

7

calculations was in the decline rates. According to our Supreme Court, "the determination of the decline to be applied to [a] lease becomes the most critical factor in establishing its valuation." *Board of Ness County Commr's v. Bankoff Oil Co.*, 265 Kan. 525, 530, 960 P.2d 1279 (1998). Hitt's methodology was based on the leases displaying hyperbolic characteristics, and Reed's methodology relied on the leases experiencing exponential decline. In determining the hyperbolic decline of the leases, Hitt assumed that the water and chemical costs associated with oil production would decrease at a rate proportionate to the decreasing oil production, which caused the value of the leases to increase. But the evidence in the record showed that while water and chemical costs did decrease over time, the rate of decrease was not proportionate to the oil production rate of decline.

BOTA also pointed out that Hitt admitted to making several mistakes in his calculations. First, Hitt mistakenly escalated the price of oil and gas in his software program, claiming that he was in a rush to finish his appraisals for the County. Second, Hitt erred by applying a Texas discount and tax burden rate of 4% instead of 5%. Third, Hitt created his own present-worth factor instead of applying the 2013 Guide's factor. Woolsey also points out that Hitt used a decline rate based on what his software program projected the decline would be in 2 or 3 years, not as of January 1, 2013. In response, the County claims that Hitt did not use a decline based on the valuation date because he was not applying the 2013 Guide, which was the purpose of deviating.

The County's principal complaint appears to be that BOTA made inconsistent findings because it first determined that the County had good cause to deviate from the 2013 Guide but then found in favor Woolsey because it followed the 2013 Guide. We are somewhat sympathetic to the County's complaint as K.S.A. 79-1456 states that a "county appraiser may deviate from the values shown in such guides on an individual piece of property *for just cause shown and in a manner consistent with achieving fair market value*." (Emphasis added.) It is obvious from BOTA's findings that it did not believe the County's deviation was consistent with achieving fair market value.

8

In making its finding on this point, BOTA relied upon our court's decision in *Cimarex Energy Co. v. Board of Seward County Comm'rs*, 38 Kan. App. 2d 298, 164 P.3d 833, *rev. denied* 285 Kan. 1173 (2007). In that case, BOTA compelled the taxpayer to disclose to the County confidential in-house information concerning its remaining recoverable oil and gas reserves because BOTA had determined the information might be relevant in determining fair market value. The *Cimarex* panel concluded that

> "BOTA's discovery order violated the 'just cause' rule in that it authorized the discovery of Cimarex's confidential in-house reserves information when the County had never shown that this information would afford a basis for achieving the fair market value of the properties. . . . BOTA never found 'just cause' to allow the County to deviate from the Guide . . . ." 38 Kan. App. 2d at 310.

We interpret BOTA's actions in our case as concluding that the County had established just cause to deviate from the 2013 Guide in order to present evidence of fair market value based upon an appraisal derived not from an exponential decline rate as provided for in the 2013 Guide but from a hyperbolic decline rate. The County's witnesses testified that these leases may have been demonstrating hyperbolic decline rates and presented expert appraisal testimony that did not rely upon the 2013 Guide. After receiving the County's evidence on this point, BOTA ultimately concluded the 2013 Guide's valuation methodology was a better indicator of the leases' fair market value. We see no error here as, unlike in *Cimarex*, the County presented evidence that deviation from the 2013 Guide was appropriate to fairly appraise the leases and presented appraisal testimony consistent with that approach. Unfortunately for the County, its evidence did not ultimately satisfy or persuade BOTA to deviate from the 2013 Guide. In our view, BOTA was not required to rule on the validity of the County's approach before accepting its evidence. BOTA opted to hear all the County's evidence before determining its efficacy. Such an approach strikes us as reasonable.

9

The County also argues Reed erred in keeping the costs in his methodology constant and did not follow the 2013 Guide in calculating the value of the leases, and that some of Hitt's mistakes benefited Woolsey. However, as another panel of our court noted in *In re Tax Appeals of EOG Resources, Inc.*, 46 Kan. App. 2d 821, 834, 265 P.3d 1207 (2011), *rev. denied* 296 Kan. 1130 (2013), if an oil lease is slightly undertaxed, a taxpayer will at some point be taxed on what was not taxed, but if a well is overtaxed, a taxpayer will be never be able to recoup the excessive tax payment from the county. Therefore, because tax statutes are to be strictly construed in the taxpayer's favor, we should err on the side of Woolsey, the taxpayer. See *In re Tax Appeal of Sprint Communications Co.*, 278 Kan. 690, 695, 101 P.3d 1239 (2004).

Because the County's valuation methodology was based on Hitt's false assumptions and calculation mistakes and was inconsistent with achieving fair market value of the leases, BOTA correctly found that Woolsey's valuation methodology was the better indicator of the leases' value.

### DID BOTA ERR IN ALLOWING WOOLSEY TO AMEND ITS VALUATION OF TWO OF THE LEASES?

The County also claims that BOTA allowed an impermissible amendment to the prehearing order by admitting Woolsey's amended valuations for two of the leases. When reviewing whether a district court, or in this case BOTA, erred in allowing the amendment of a pretrial order, this court applies an abuse of discretion standard of review. See *State Farm Fire & Cas. Co. v. Liggett*, 236 Kan. 120, 124-25, 689 P.2d 1187 (1984). Judicial discretion is abused if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013).

K.A.R. 94-5-1 (2014 Supp.) provides that unless other authorities specifically apply, the Kansas Code of Civil Procedure, K.S.A. 60-101 *et seq.*, applies to BOTA proceedings. A court "may modify the order issued after a final pretrial conference only to prevent manifest injustice." K.S.A. 2015 Supp. 60-216(e); see also *Boyle v. Harries*, 22 Kan. App. 2d 686, 690, 923 P.2d 504 (1996) (noting trial court's broad discretionary power to amend pretrial orders). In *In re Marriage of Merz*, No. 96,042, 2007 WL 656420, at *3 (Kan. App. 2007) (unpublished opinion), which BOTA cited in its order, another panel of our court stated:  "Cases applying the 'manifest injustice' standard have been very fact intensive. The courts have been more willing to permit amendments to pretrial orders when the amendments alter evidence used, but not the parties' claims."

The County argues that by changing the valuation of the two leases, Woolsey effectively amended the prehearing order without filing an amendment, even though the order did not allow amendments. It also contends that Woolsey's expert never provided the County with an updated expert report and that the change was not just a change in number but added a new claim to the case because the County was now relying on post-valuation date production data.

At first blush, it does seem that Woolsey, by changing the valuation of two of the leases, is asserting a new theory that prior caselaw allows an appraiser to sometimes consider post-valuation date production data when calculating the value of a well. However, the difference between Woolsey's valuations was $2,752,496. Common sense and logic dictate that—with a difference of almost $3 million—allowing Woolsey to in effect amend the prehearing order prevented manifest injustice. Further, "[t]he essential purpose of pretrial conference procedure is to prevent surprise and enable the parties to prepare for trial with the assurance that contentions, issues, and evidence will not be moving targets." *Norton Farms, Inc. v. Anadarko Petroleum Corp.*, 32 Kan. App. 2d 899, 904, 91 P.3d 1239 (2004). And Woolsey's new valuations were no surprise to the County because Reed had provided the County with the new valuations at his deposition—more

11

than 60 days before the hearing. Finally, BOTA noted that it typically had open pleadings and it had the discretion to allow the prehearing order to be amended, even if the order stated no amendments. BOTA, therefore, did not abuse its discretion in allowing Woolsey to change the valuation of the leases.

### DID BOTA ERR BY ADMITTING AND RELYING ON POST-VALUATION DATE PRODUCTION DATA?

Finally, the County claims that BOTA should not have relied on the leases' production data after the January 1, 2013, valuation date. As previously stated, we review a decision from BOTA in the manner prescribed by the KJRA.

The County argues that post-valuation date production data after the first 3 months after the valuation date cannot be considered, citing *Bankoff*, 265 Kan. 525 and *EOG Resources*, 46 Kan. App. 2d 821. Reed initially used production data from the first quarter of 2013 to determine the decline curves in all of the leases. Then, after learning about the *Bankoff* and *EOG Resources* decisions, which he interpreted to mean that he could consider all post-valuation date production data, he updated the valuations for two of the newer leases. Although the updated renditions indicate that both leases have a "50% decline rate based on actual declines through 2014," it appears to us, based on Reed's testimony and Woolsey's brief, that Woolsey's purpose for using the post-valuation date production data was to confirm—not calculate—the decline rates. Reed also testified that his initial valuations underestimated the decline rate, and that even if he had not utilized post-valuation date production data, his decline rate would still have been at least 50%.

In *Helmerich & Payne*, 34 Kan. App. 2d at 58, another panel of our court found that BOTA erred in determining the taxpayer's decline rate was calculated mainly from post-valuation date production data when, in fact, the evidence showed that the post-

12

valuation date production data confirmed the figures from the applicable tax year. In *Bankoff*, 265 Kan. at 542, where the former PVD Oil and Gas manager took into account production data from June or July, our Supreme Court found that "production data pertaining to periods after January 1 is relevant to a determination of the property's future productivity and earning potential as of January 1, particularly when there have been significant changes in production late in the year prior to assessment." However, while our Supreme Court has held that data from 28 and 40 months after the valuation date is not permissible, see *In re Tax Appeal of ANR Pipeline Co.*, 276 Kan. 702, 722, 79 P.3d 751 (2003), the court has never stated how long after January 1 an appraiser may take into account production data. Other panels of our court have considered first quarter production data as relevant in determining future earning potential and productivity. See *EOG Resources*, 46 Kan. App. 2d at 836; *Helmerich & Payne*, 34 Kan. App. 2d at 62.

The County relies on *ANR Pipeline*, 276 Kan. at 722, quoting the same sentence twice: "A correct reading of *Bankoff* demonstrates that consideration of post-valuation data becomes admissible when no data is available and the time lapse is within close proximity to the evaluation date." However, our Supreme Court was not considering the valuation of oil wells in *ANR Pipeline*; the post-valuation date data was income data, not production data. 276 Kan. at 722. *ANR Pipeline* distinguishes *Bankoff*, and perhaps limits it, but does not overrule it. Further, as Woolsey looked only at the post-valuation date production data to confirm the decline rate, then *ANR Pipeline*'s effect on *Bankoff* is immaterial to this case. As our court has continued to apply *Bankoff* when deciding the proper valuation of oil wells, see 46 Kan. App. 2d at 826-30, 36, we conclude the County's reliance on *ANR Pipeline* is misplaced given Reed's testimony that he used post-valuation date production data to merely confirm, and not calculate, the decline rates. BOTA did not err in admitting and considering this evidence.

Finally, we note briefly that Woolsey makes an argument that our approval of the County's deviation from the 2013 Guide would violate the uniform and equal standard in

the Kansas Constitution. However, we discard the issue as not properly preserved because Woolsey failed to raise the issue. Moreover, even if it had been properly raised by Woolsey in a cross-appeal, the issue is moot because we agree with BOTA's application of the 2013 Guide to value the oil and gas leases in question. See *Manly v. City of Shawnee*, 287 Kan. 63, 74, 194 P.3d 1 (2008).

Affirmed.